# The Chicago and Alton Railroad Company

*v.*

# Delia Shea.

1. Evidence—*weight as between different witnesses.* The testimony of a witness which is clear and positive as to a certain transaction, is entitled to greater weight than that of another who remembers nothing of such transaction except from seeing his handwriting in a receipt given by him.

2. Common carrier—*nature of his undertaking.* A common carrier, being regarded in the light of an insurer, is answerable for every loss which can not be attributed to the act of God or a public enemy; and he becomes an insurer for the safe delivery of an article delivered to him which he is bound to carry.

3. Same—*qualification of rule in case of fraud.* The strict rule of the carrier's responsibility is subject to this important qualification, that, if the owner of goods is guilty of any fraud or imposition in respect to the carrier, as by concealing their nature or value, or where he deceives the carrier by his own carelessness in treating the parcel as a thing of no value, he can not hold the carrier liable for loss of the goods.

4. Same—*fraudulent concealment and imposition by shipper.* Where a shipper delivered to a carrier for transportation a bundle having the appearance of bedding only, but which in fact contained inside the bedding valuable clothing, such as a silk dress, a brocha shawl and furs, of the value of $200, which fact was not disclosed, and thereby shipped them at a low rate of freight, it was *held,* that this was such an imposition and fraud practiced upon the carrier as to release him from liability for loss, except as to what might properly be termed bedding.

5. Bailment—*party plaintiff—estoppel.* Where goods were shipped by a married woman and a receipt therefor given to her, in a suit by her to recover for their loss it was urged that she, not being the owner, could not sue in her own name, but should have sued in her husband's name; but it was *held,* that, as she was the bailor and consignor, she had a right to maintain the action, and that the defendant, having recognized her as the owner in receiving the goods, was estopped from disputing her ownership when sued for the loss.

Appeal from the Circuit Court of Sangamon county; the Hon. John A. McClernand, Judge, presiding.

Messrs. Hay, Greene & Littler, for the appellants.

Messrs. Matheny & McGuire, for the appellee.

Mr. Justice Breese delivered the opinion of the Court:

This was an action of assumpsit, in the Sangamon circuit court, brought by Delia Shea against the Chicago and Alton Railroad Company, to recover damages for a breach of their undertaking to carry, from Springfield, in this State, and deliver at Marionville, Missouri, certain goods and chattels to them delivered by the plaintiff for such purpose, and which they failed to do. There was a trial by jury, resulting in a verdict for the plaintiff. A motion for a new trial was overruled and judgment rendered on the verdict, to reverse which the railroad company appeal.

The plaintiff herself was the only witness testifying to the goods and their value. Her testimony is clear as to the fact of delivery to appellants' agent at Springfield, and of the value of the goods.

Appellants make the point, first, that, according to the preponderance of the evidence, the misdirection of the goods was wholly chargeable to the plaintiff.

The plaintiff testified she delivered the goods to the agent with a letter of direction, and told him to send the goods to Pat. Shea, at Marionville, Missouri. The next day, on inquiry by the plaintiff, the agent said they were correctly

marked and shipped; then went with her husband to Marion-ville, Missouri, and the agent there informed her the goods had gone to Marionville, Kansas.

On cross-examination, she stated she was delayed at Chatham, sick, one week; then went to Springfield, Missouri, the nearest station on the railroad to Marionville, and where the goods would stop on their way to Marionville; met her husband at Springfield; went there to get the goods; went from there to Dallas county; there were only two packages shipped, a chest, and a bundle made up of a feather bed and articles inside of it; they had no mark on them when taken to the depot at Springfield, Illinois, except a card on which was her husband's name, and Marionville, Missouri; gave the man at the depot a letter and told him to mark the goods by that letter. The heading of this letter was as follows: " 20 section, S. P. R. R., Marionville, Missouri, April 7, 1870."

The witness then described all the articles in the chest and bundle.

W. J. Flynn testified, for appellants, that, at the time spoken of, he was check clerk of this company at Springfield, Illinois; don't know that he ever saw the woman who had testified; knows that he marked the goods; never knew the contents of the packages; a woman brought him a letter and the goods; she did not want the goods sent to the place named in the letter; marked them strictly as she directed; don't remember what she said; was not his duty to mark goods; not allowed to receive goods unless marked; marked them for the accommodation of the woman, not for the railroad company. The covering of the chest being produced, and witness asked if he recognized it, the address being " P. Shea, Marionville, Kansas," he said he wrote the address except the word " Missouri" crossed out; that was not there when he marked the goods; don't remember the woman nor the conversation with her; did not think the letter-head was the same shown him by the witness.

The railroad receipt was then produced by the plaintiff, and witness said he made it out and marked the goods as they are in the receipt; knows he gave the receipt only from the fact that it is in his handwriting.

This receipt reads, "Received of Mrs. I. Shea, in apparent good order, and to be transported," etc. Dated at Springfield, Ill., 29th April, 1870. In the margin appear these words: "P. Shea, Marionville, Lawrence county, Kansas."

Here is a conflict of evidence which the jury alone could settle, and we have no hesitancy in coming to the same conclusion the jury did. The witness Flynn remembers nothing of the transaction only from seeing his handwriting in the receipt; remembers none of the directions given him by the plaintiff; recollects nothing of the letter-head shown him, but says he does not think it is the same as the one shown him. On all these points the testimony of the plaintiff is clear and positive, and was entitled to more weight with the jury than the testimony of Flynn. As to the address on the chest, it is very certain it once had the proper address, "Missouri," but by some unexplained means, that word was erased, and "Kansas" substituted.

As to the bill of lading, or receipt, it required but little persuasion to induce a jury to believe that the agent, through inattention, made the mistake. How often are such agents careless and inattentive, seeming to take no interest in property committed to their charge, and, if not carefully supervised, as apt to give a wrong direction to a package as the right one. All the facts about the receipt of the goods by the agent were fully before the jury, and the directions given the agent were positively sworn to. He did not obey them, and his superiors must be accountable for the natural consequences flowing therefrom.

Under this head, appellants say, the testimony of the plaintiff was extraordinary; that, being the wife of a poor man, a laborer on a railroad, she should possess silk dresses, costly furs and solid silverware, is very strange, and what is more

singular is the placing such goods in the package, and their existence not sought to be established by any evidence except her own testimony.

This is a fair argument for the jury, and was doubtless used before them, and they may have thought, and did think, it was not impossible or improbable that the wife of a railroad laborer might be the owner of such property. It is certain she was not required to tell where or how she got all of it. Some of it—the blankets, the silk poplin dress and the brocha shawl—she said were the gift of her husband; the set of mink furs, the victorine and the muff, were a present from her brother.

Appellants urge that her testimony is not only singular and extremely suspicious in itself, but is rendered more so by the testimony of the Beebes, husband and wife. That testimony, the jury might well say, as we would say, related to a different person, one Phœbe Shea, a woman twenty-eight or thirty years old two years before they testified, and weighing one hundred fifteen or twenty pounds. To this Phœbe Shea they knew of a box and bundle being shipped, marked "P. Shea, Columbus, Kansas." This box was opened by the Beebes, and an inventory taken of old duds, worth in all about sixty-seven dollars. This could not, by any possibility, be the chest and bundle shipped by appellee, as on the cover of that chest was this address: "P. Shea, Marionville, (Missouri crossed out,) Kansas." On this chest the initial "P." stood for "Patrick," plaintiff's husband; on the other box, marked "Columbus, Kansas," that "P." stood for "Phœbe," who, doubtless, owned it and its contents.

An intelligent jury, as this was who tried this cause, or presumed to have been, and as all juries are, or presumed to be, must have fully considered that railroad companies, perhaps in a greater degree than others, are subject to gross impositions in cases of this character, and in considering this fact, they could readily believe, under the strong facts of this

case, that the box with the goods marked to "P. Shea, Columbus, Kansas," was not the box delivered by the plaintiff to be marked " P. Shea, Marionville, Missouri," and which appears to have been so marked, but "Missouri" erased and the word "Kansas" added.

The next point made by appellants is, that, admitting the plaintiff's statements to be true, they show she committed a fraud on the company, and ought not to recover.

Whilst appellants are willing to admit the law is well settled that it is not the duty of a carrier to inquire as to the contents of packages delivered for shipment when such contents are not known, yet it is not less a fraud in the shipper to do any act by which such inquiry is avoided or precluded.

When the chest and bundle were delivered to the agent, no inquiry was made by him of the contents of either, nor were any representations made by the plaintiff as to their contents. On the receipt given to her, is this entry under the head "Articles:" 1 chest goods, 1 bundle bedding. This description was undoubtedly true, for the testimony establishes it. What did the bundle of bedding indicate? Nothing more than what it appeared. It was, in appearance, a bed and bedding, packed or rolled into a bundle, and was received as such, and no doubt passed as in the lowest class of freight, and rated accordingly. No person, seeing such a bundle, presenting all the external evidences of its real nature, could for a moment suppose it contained within it, in the form of silk dresses, a valuable shawl, a set of furs, and other articles, in all valued at near two hundred dollars. It was received as a bundle of bedding, and the servants of the company could not have considered it as anything else than what it appeared to be. Such a bundle, from its appearance, would indicate a value of perhaps thirty or forty dollars.

Waiving the question whether a carrier is bound to inquire into the contents or value of packages intrusted to him, or the shipper to disclose it, it is well settled the latter has no right to use any deception with the carrier.

A common carrier is regarded in the light of an insurer, and the courts of this country and of England have steadily adhered to the rules public policy has demanded should be prescribed for him, and which have proved of such great value to the morals and commerce of both countries. He being regarded in the light of an insurer, he is answerable for every loss which can not be attributed to the act of God or a public enemy. The law presumes against the common carrier. Although this is so, and he is responsible for the loss of an article delivered to him which he is bound to carry, and becomes the insurer for its safe delivery, the rule itself is subject to a reasonable qualification, for, if the owner of the article is guilty of any fraud or imposition in respect to the carrier, as, by concealing the nature or value of the article, or deludes the carrier by his own carelessness in treating the parcel as a thing of no value, the owner can not hold the carrier liable for the loss of the goods. Such an imposition destroys all just claim to indemnity, for the reason it goes to deprive the carrier of the compensation which he is entitled to in proportion to the value of the article intrusted to his care, and the consequent risk which he incurs; and it tends to lessen the vigilance the carrier would otherwise bestow. 2 Kent's Com. 802.

The same doctrine is found in Story on Bailment, sec. 565, and in the cases cited by appellants: *Relf* v. *Rapp*, 3 Watts & Serg. 21; *Hollister* v. *Nowlen*, 19 Wend. 234, and *Cole* v. *Goodwin et al.* ib. 251.

This court, in *Chicago and Aurora R. R. Co.* v. *Thompson*, 19 Ill. 578, had occasion to examine this question, and it will there be found discussed at some length.

That was a case where a box had been delivered by the plaintiff to the railroad company to be carried from Aurora to Earlville and there delivered. The box was lost. The plaintiff brought his action, claiming that in this box there were seven hundred and fifty dollars in money, besides articles proper to be carried in a box of mean appearance such as this

was. After discussing the question as to whether this money, composed of bank bills chiefly, was goods and chattels, and admitting the company were common carriers of bank bills for hire, the court said, on receiving them, they became insurers against every thing but inevitable accident, and the principles appertaining to the relation of insurer and insured must apply. The company is the insurer, the owner, or party freighting, the insured, and the premium is the price paid for transportation, or freight charges, bearing some proportion to the risk; their insurance being in respect of the reward they are to receive. Now, to make a contract of insurance valid and binding, there must be good faith on the part of the insured. After commenting on the case of *Carter* v. *Boehm*, 3 Burr. 1905, the court say, it seems that concealment, or the suppression of any fact or circumstance material to the risk, is fatal to the contract; without any special agreement, it is a species of fraud, a *suppressio veri*, rendering the contract void *ab initio*. Testing the case by these principles, the carriers were held not liable for the bank bills, for, although there were no verbal representations of any kind made by the shippers, there was that which was equivalent to it in the structure and appearance of the box in which it is said those bills were placed; that, according to the description given of it by the witnesses, told only the plain and simple tale, that tools, bedclothes and bedding, and some other cheap articles, were in it—such as were usually in such a box for the usual freight charges.

The fact most important to the insurers to know, that, among this paltry stuff was a valise with seven hundred and fifty dollars in bank bills in it, was not disclosed. The owner treating the box as of no particular value, shipping it as common freight, concealing its true value, deludes and deceives the carrier; an imposition is practiced upon him to deprive him of the compensation to which he is entitled, that being in some proportion to the value of the article intrusted to his

care, and the consequent risk he incurs, and it tends to lessen the vigilance he would otherwise bestow.

The English and other authorities are referred to and commented on, and the court said, in this case, as in *Paynton's case*, 4 Burrows, 2298, the owner of the money was guilty of a fraud upon the carrier in concealing in a rough box, stuffed with feather beds and bedding, tinware, dishes, etc., a very large sum of money. This artifice, giving the box a mean or common appearance, and thereby inducing the carrier to think it of no particular value, and so prevent him from making inquiries, ought to be regarded as pregnant proof of fraud. It was no answer to say that the carrier made no inquiry about the box. The artifice resorted to precluded inquiry. It was complete. There was nothing about it to excite special attention to it. The owner gave out that the box was not more valuable than it appeared to be, by treating it with so little care as he did, provoking a corresponding care only on the part of the carrier.

It was on substantially the same principles the case of *The Cin. and Chi. Air Line R. R. Co.* v. *Marcus*, 38 Ill. 219, was decided. There it was held that, to create the liability of common carriers, the shipper must act in good faith; that fraud avoids all contracts. The case in 21 Ill. *supra*, was there cited and approved.

Neither of these cases is cited by appellants. For aught we can see, they cover the principles for which they contend, and we have no desire to take back anything material said in them.

This case is so much like *Thompson's case*, *supra*, that the difference is immaterial. It may be said in this case, as in that, good faith was required of this plaintiff in shipping her goods, and she had no right to resort to any artifice in that behalf, calculated to deceive the carrier. Though she made no verbal representations to him as to the value of the goods, she did, by the shape she gave them, tell him it was a bundle of bedding—only that and nothing more. That told only a

simple tale.   The fact most important for the carrier, he being an insurer, that, in that plain bundle of bedding there were goods of the value of near two hundred dollars, was withheld. She herself treating the bundle as one of bedding only, and of no great value, shipping it as low class freight, concealing its true value, deluded and deceived the carrier; an imposition was practiced upon him, to deprive him of the compensation to which he was entitled, that being in some proportion to the value of the articles intrusted to him, and the consequent risk he incurred, and tended to lessen the vigilance he might otherwise have bestowed.   The artifice resorted to precluded inquiry by the carrier.   Who would think of asking the shipper of a feather bed and bedding, rolled up in a bundle, if it contained silk dresses, brocha shawls, victorines, or sets of furs?   We think this point is well made.

The remaining point, and which appellants insist is their main point, brings up the question of the right of this plaintiff, being a married woman, to an action for this property. We do not consider that any question, such as appellants seek here to raise, belongs to the case.   It is quite immaterial who was the absolute and legal owner of this property.   It is sufficient the plaintiff was the bailor and consignor, as appears by the receipt, and that such a party can sue, is well settled. *G. W. R. R. Co. of* 1859 v. *McComas,* 33 Ill. 186.

That the plaintiff had a right to ship her own property by rail, will not be questioned.   The company, having recognized her as the owner, are not now at liberty to dispute it.   The question can only be raised by the husband or a creditor.

It appears in the case, that the box, or chest, and bed, were recovered by appellants, and produced for the examination of appellee.   For the contents of the chest and their value, she could undoubtedly recover.   It appeared, on examination, many of the articles contained in it when delivered to appellants, had been abstracted.   For these the right to recover is undoubted, but for the articles said to have been concealed in the bed and bedding, appellee is not entitled to recover, save

only for such articles therein as can be properly called bedding, such as pillows, blankets, and the like.

For the reasons given the judgment is reversed, and the cause remanded for further proceeding consistent with this opinion.

*Judgment reversed.*